NEY GRIEVANCE COMMISSION AGAINST JULIA COL-
TON–BELL.

76 A.3d 1049

**In re RYAN W.**

**Nos. 95, 101 Sept. Term, 2012.**

Court of Appeals of Maryland.

Sept. 26, 2013.

580

Ramesh Kasarabada (Legal Aid Bureau, Inc., Baltimore, MD), on brief, for Petitioner.

Julia Doyle Bernhardt, Asst. Atty. Gen. (Hilma J. Munson, Asst. Atty. Gen.; Douglas F. Gansler, Attorney General of Maryland, Baltimore, MD), on brief, for Respondent.

Argued before BARBERA, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, McDONALD and BELL *, JJ.

HARRELL, J.

These combined cases [1] arose initially from a 16 June 2011 order entered by the Circuit Court for Baltimore City, sitting as the juvenile court, directing the Baltimore City Department of Social Services ("the Department") to hold in a constructive trust funds the Department received, in its capacity as representative payee, from the Social Security Administration ("SSA") on behalf of Ryan W. ("Ryan"), a Child in Need of Assistance ("CINA"). Born on 26 February 1993, Ryan entered the care of the Department at age 9 after a 4 June 2002 determination by the Circuit Court that he was a CINA. That

---

* Bell, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in reaching the decision in this case.

**1.** The first three questions presented to the Court *infra* are raised by Ryan W. in case No. 95. The fourth question urged upon us, whether sovereign immunity bars Ryan W.'s claims in No. 95, is advanced by the Baltimore City Department of Social Services in No. 101.

determination rested on allegations that his drug-addicted parents neglected Ryan and his siblings. Ryan's parents died while he was in foster care. The Department filed an application with the SSA to be appointed his representative payee for Old Age and Survivor's Disability Insurance ("OASDI") benefits to which Ryan was entitled following his parents' deaths. After being appointed as Ryan's representative payee by the SSA, the Department received his benefit payments and applied them to reimburse itself partially for the current cost of Ryan's foster care. Ryan challenged subsequently in the Circuit Court this allocation of his benefit funds by filing a pleading styled as a "motion to control conduct," alleging that the Department failed to make an individualized determination of what was in Ryan's best interests in the application of the proceeds and that the benefits should have been conserved instead for his use in transitioning by age out of foster care. The Circuit Court agreed with Ryan's contentions, leading to establishment of the constructive trust and subsequent appellate scrutiny of that judgment.

We conclude that, under the Social Security Act and the Family Law Article of the Maryland Code, a local department of social services, acting in the capacity as an institutional representative payee appointed by the Commissioner of the Social Security Administration, has discretion to apply a CINA foster child's OASDI benefits to reimburse the Department for its costs incurred for the child's current maintenance, but must provide notice to the child and/or his or her legal representative that the Department applied to the SSA and received such benefits on the child's behalf. Thus, we shall affirm in part and reverse in part the judgment of the Court of Special Appeals in No. 95 and dismiss No. 101 as moot.

## RELEVANT STATUTORY AND REGULATORY CONTEXT

### Social Security Act and Federal Regulations

In 1939, Congress added OASDI to the Social Security Act, 42 U.S.C. § 401 *et seq.*, which provides for, among other

things, monthly benefit payments to certain members of a deceased wage-earner's family. *Astrue v. Capato ex rel. B.N.C.,* — U.S. ——, ——, 132 S.Ct. 2021, 2027, 182 L.Ed.2d 887, 895 (2012). A dependent child who survives his wage-earning parent may be entitled to receive survivor's benefits if the child is unmarried and under the age of 18 (or 19 if attending school full time). 42 U.S.C. § 402(d). "An applicant qualifies for such benefits if [he or] she meets the Act's definition of 'child,' is unmarried, is below specified age limits (18 or 19) or is under a disability which began prior to age 22, and was dependent on the insured at the time of the insured's death." *Astrue,* — U.S. ——, ——, 132 S.Ct. at 2027, 182 L.Ed.2d at 895 (citing 42 U.S.C. § 402(d)(1)). The wages earned by the deceased parent prior to his or her death determine the amount of the benefit. *Id.*

A representative payee may be appointed for a child entitled to OASDI benefits if the Commissioner of the SSA determines that the interests of the beneficiary will be served by doing so. 42 U.S.C. § 405(j)(1)(A). "[E]very beneficiary has the right to manage his or her own benefits. However, *some beneficiaries due to a mental or physical condition or due to their youth may be unable to do so.*" 20 C.F.R. § 404.2001(b)(1) (emphasis added). Generally, a representative payee is appointed for child beneficiaries under the age of 18, unless the child "shows the ability to manage the benefits." [2] 20 C.F.R. § 404.2010(b).

---

**2.** Examples of situations allowing for direct payments to a child younger than 18 include:

(1) Receiving disability insurance benefits on his or her own Social Security earnings record; or

(2) Serving in the military services; or

(3) Living alone and supporting himself or herself; or

(4) A parent and files for himself or herself and/or his or her child and he or she has experience in handling his or her own finances; or

(5) Capable of using the benefits to provide for his or her current needs and no qualified payee is available; or

(6) Within 7 months of attaining age 18 and is initially filing an application for benefits.

20 C.F.R. § 404.2010. There is no evidence in this record that Ryan W. possessed an "ability to manage the benefits."

The SSA aims to select "the person, agency, organization or institution that will best serve the interest of the beneficiary" when appointing a representative payee. 20 C.F.R. § 404.2020. In determining who will best serve the child's interests, the SSA considers:

(a) The relationship of the person to the beneficiary;

(b) The amount of interest that the person shows in the beneficiary;

(c) Any legal authority the person, agency, organization or institution has to act on behalf of the beneficiary;

(d) Whether the potential payee has custody of the beneficiary; and

(e) Whether the potential payee is in a position to know of and look after the needs of the beneficiary.

20 C.F.R. § 404.2020(a)-(e). The SSA prioritizes also categories of persons or entities whom the Administration prefers to appoint as a child's representative payee:

(1) A natural or adoptive parent who has custody of the beneficiary, or a guardian;

(2) A natural or adoptive parent who does not have custody of the beneficiary, but is contributing toward the beneficiary's support and is demonstrating strong concern for the beneficiary's well being;

(3) A natural or adoptive parent who does not have custody of the beneficiary and is not contributing toward his or her support but is demonstrating strong concern for the beneficiary's well being;

(4) A relative or stepparent who has custody of the beneficiary;

(5) A relative who does not have custody of the beneficiary but is contributing toward the beneficiary's support and is demonstrating concern for the beneficiary's well being;

(6) A relative or close friend who does not have custody of the beneficiary but is demonstrating concern for the beneficiary's well being; and

(7) *An authorized social agency or custodial institution.*
20 C.F.R. § 404.2021(c) (emphasis added).

The SSA provides beneficiaries with written notice that the Administration will appoint a representative payee before the payee is appointed officially, 20 C.F.R. § 404.2030(a), and before certifying payment to the payee. 42 U.S.C. § 405(j)(2)(E)(ii). If the beneficiary is "under age 15, an unemancipated minor under the age of 18, or legally incompetent, [the] written notice goes to [the beneficiary's] legal guardian or legal representative." 42 U.S.C. § 405(j)(2)(E)(ii); 20 C.F.R. § 404.2030(a).

The notice required by statute must include language explaining a beneficiary's right to appeal the appointment of a particular entity as the representative payee. 42 U.S.C. § 405(j)(2)(E)(ii); 20 C.F.R. § 404.2030(a). SSA regulations explicitly provide for both administrative and judicial review of, among other things, "initial determinations" made by the agency. 20 C.F.R. § 404.902. "Initial determinations" are defined by regulation (somewhat circularly) as decisions made by the SSA which are subject to administrative and judicial review. 20 C.F.R. § 404.902. The SSA's decision of who will serve as an OASDI beneficiary's representative payee is listed as an example of an "initial determination" and is thus subject to both administrative and judicial review. 20 C.F.R. § 404.902(q).

Once appointed, a representative payee is required to use the benefit payments solely for the beneficiary's "use and benefit in a manner and for the purposes [the representative payee] determines ... to be in [the beneficiary's] best interests." 20 C.F.R. § 404.2035(a). The SSA views costs associated with the beneficiary's "current maintenance" to be valid expenditures satisfying the requirement that benefit payments be applied "for the use and benefit" of the beneficiary and in line with his or her "best interests." 20 C.F.R. § 404.2040(a)(1). "Current maintenance includes cost[s] incurred in obtaining food, shelter, clothing, medical care, and personal comfort items." 20 C.F.R. § 404.2040(a)(1). For

beneficiaries receiving institutional care because of a physical or mental disability, the definition of "current maintenance" expands to include "the customary charges made by the institution, as well as expenditures for those items which will aid in the beneficiary's recovery or release from the institution or *expenses for personal needs which will improve the beneficiary's conditions while in the institution.*" 20 C.F.R. § 404.2040(b) (emphasis added). Past debts of the beneficiary that arose before the first benefit payment was made to the representative payee are not regarded as a legitimate expenditure of benefit funds unless "the current and reasonably foreseeable needs of the beneficiary are met." 20 C.F.R. § 404.2040(d). Conservation and investment of benefit payments is required whenever there is a surplus after all required uses of the payments are made. 20 C.F.R. § 404.2045(a).

### Maryland's Family Law Article and Related Regulations

The Family Law Article of the Maryland Code mandates that the Department of Human Resources ("DHR") provide "child welfare services" to foster children. Md. Code (1984, 2006 Repl. Vol.), Fam. Law § 5–524. When a foster child is unable to return to his parent or guardian, DHR must "develop and implement an alternative permanent plan for the child." *Id.* at § 5–524(3).

As a last resort, the Department will commit a child to foster care when no other placements are viable, for which the Department is required to pay for the services a foster care placement provides. Md. Code (1984, 2006 Repl. Vol.), Fam. Law § 5–526(a)(1) ("The Department shall provide for the care, diagnosis, training, education, and rehabilitation of children by placing them in group homes and institutions that are operated by for-profit or nonprofit charitable corporations."). The Department is required to reimburse these charitable corporations for the costs of services provided to the foster children at a rate set by the Department and in line with the State budget. *Id.* at § 5–526(b)(1).

All of a child's resources, including "survivor's disability insurance," are subject to allocation by the Department to reimburse itself for the "cost of care" of a foster child in an out-of-home placement. COMAR 07.02.11.29(A), (K)(1). Subsection (K)(1) of this regulation identifies explicitly "survivor's disability insurance" as an example of resources that may be tapped by the Department for self-reimbursement. Foster children over the age of 18 in an out-of-home placement, if entitled to survivor's disability benefits, may elect either to receive the payments themselves and then reimburse the Department, or to have the Department appointed as the child's representative payee for the benefits (assuming that the SSA has made a determination that the Department is the appropriate representative payee for the child). *Id.* at (K)(2).

The Department may use the child's resources subject to the following priorities: first, for the "cost of care;" [3] next, for the child's "special needs;" and, finally, if any resources remain, for "a savings account for future needs." *Id.* at (L). Excess funds from the child's resources not utilized consistent with regulation by the Department before the child leaves out-of-home placement must be returned to the child if he or she is 18 or older, *id.* at (M)(1), or "transferred to the legal parent or guardian with whom the child will reside," if he or she is under 18 years old. *Id.* at (M)(2).

## FACTUAL AND PROCEDURAL BACKGROUND

### *Determination that Ryan was a CINA and the Statutory Framework for CINA*

The Circuit Court for Baltimore City, sitting as the juvenile court, determined that Ryan W. was a CINA on 4 June 2002 when he was nine years old. The Courts and Judicial Proceedings Article ("CJP") of the Maryland Code, § 3–801 *et seq.*, provides the framework for determining whether a child

---

**3.** The "cost of care" includes "the board rate, clothing allowance, any medical care payments made on behalf of the child, and any supplemental purchases made to meet the child's special needs." *Id.* at (B).

is a CINA. When the Department learns that a child is being abused or neglected, or suffers from a developmental disability or mental disorder, and is not receiving proper care and attention to his or her needs, the particular locality's Department of Social Services may file a petition seeking a determination by the respective juvenile court that the child is a CINA. Md. Code (2001, 2006 Repl. Vol.) CJP §§ 3–801(f), 3–809(a). Once a petition is filed, the juvenile court must hold an adjudicatory hearing to determine if the facts alleged can be proven. Md. Code (2001, 2006 Repl. Vol.) CJP §§ 3–801(c), 3–817(a) and (c). If the allegations are proven to the satisfaction of the juvenile court, the court must determine whether the child needs assistance and how the court should intervene "to protect the child's health, safety, and well-being." Md. Code (2001, 2006 Repl. Vol.) CJP §§ 3–801(m), 3–819(a)(1). If the court determines the child is in need of assistance, it may commit, among other things, the child to the custody of the Department. CJP § 3–819(b)(1)(iii). The Department must establish then an out-of-home placement for the CINA in foster, kinship, group, or residential treatment care. Md. Code (1984, 2012 Repl. Vol.) [4], Fam. Law §§ 5–501(m), 5–525(b)(1)(ii). Further, the Department must prepare a "permanency plan" that outlines the goals aimed at a child's exit from commitment to foster care. See CJP § 3–823(d). The juvenile court must hold a hearing (called a "permanency planning hearing") to determine this plan initially, CJP § 3–823(b)(1), and must review the plan every six months until the child exits the Department's care. CJP § 3–823(h)(1)(i).

Here, the Department filed a petition with the Circuit Court for Baltimore City on 23 January 2002, seeking a determination that Ryan was a CINA. As a basis for the determination sought, the Department cited Ryan's mother's drug abuse and his father's alcohol abuse, their failure to provide adequate food and clothing for their children, their lack of supervision,

---

4. This section has not been amended since 2002 and is substantively the same as the controlling provisions during the relevant time of the Department's conduct in Ryan's case.

and their failure to ensure the children attended medical appointments and school on time. Following a hearing, Ryan was placed in emergency shelter care by order dated 13 February 2002, and was determined on 4 June 2002 to be a CINA and committed to the custody of the Department. As noted previously, Ryan was nine years old at that time.

### Post–CINA Determination Actions

Subsequent to his commitment to the Department's custody, Ryan was placed in various group homes and non-relative foster homes. The Department paid the cost of his care. Ryan's mother died in August 2006. His father died in November 2008. In June 2009, Ryan's DSS-assigned case-worker at the time, Nathan Exom, submitted copies of Ryan's parents' death certificates to the Department's Foster Care & SSI Reimbursement Unit ("Reimbursement Unit"). In November 2009, the Reimbursement Unit filed an application with the SSA seeking appointment as Ryan's representative payee for his Old–Age, Survivor's and Disability Insurance ("OASDI") benefits.[5] *See* 42 U.S.C. § 405(j)(1)(A); *see also* COMAR §§ 07.02.11.29(K) and (L) (providing that the Department should seek all resources for which a child is eligible, including survivor's insurance benefits, and apply them to the costs of foster care). The application was approved shortly thereafter. The Department provided no notice to Ryan, his CINA counsel, or the juvenile court that it applied to be, and was approved as, Ryan's representative payee. The SSA sent its required notice to the Department in its capacity as Ryan's legal guardian. *See* 42 U.S.C. § 405(j)(2)(E)(ii); 20 C.F.R. § 404.2030(a).

A beneficiary child is entitled to OASDI benefits for each parent that dies. Here, Ryan was entitled to benefits from

---

**5.** Federal regulations allow payment to be made directly to a child who is under 18 if the child is "[c]apable of using the benefits to provide for his or her current needs" and if "no qualified payee is available." 20 C.F.R. § 404.2010(b)(5). Because Ryan W. was deemed incapable of managing his own benefits, and because the Department was available to serve as his representative payee, payments were not eligible to be made directly to Ryan W. He does not contend otherwise here.

both his mother and father. The Department received two lump sum payments for OASDI benefits covering the interim between the deaths of Ryans' parents and the filing of the application. The Department received the first of these payments on 13 November 2009, in the amount of $8,481, which covered the benefits accrued between Ryan's father's death and the start of benefit payments (November 2008 to November 2009), and represents the benefits to which Ryan was entitled from his father's wages. The second lump sum payment, in the amount of $11,647.50, was received on 15 December 2009, and covered the period August 2006 to November 2008, representing the benefits to which Ryan was entitled based on his mother's wage earnings. From December 2009 until February 2011, when Ryan turned 18, the Department received a monthly $771 OASDI benefit payment on Ryan's behalf. Ultimately, as of the time of trial in this case, the Department received a total of $31,693.50 in its capacity as Ryan's representative payee for OASDI benefits and used the entire amount to reimburse itself for some of the costs of Ryan's foster care.

### *In re Ryan W.*

Ryan W., through counsel, filed, on 5 April 2011, with the juvenile court a "motion to control conduct," alleging that the Department, as Ryan W.'s representative payee, applied for and received his OASDI benefits without notifying the child or his CINA attorney and misused the funds in violation of its statutory and fiduciary duties. Specifically, Ryan contended that the Department allocated improperly his benefits to reimburse itself for the costs of his foster care, without an individualized determination as to what other use of the funds might be in his best interests. *See* 42 U.S.C. 405(j)(1)(A) (mandating that representative payees apply benefits to the best interests of the beneficiary); *see also* 42 U.S.C. 405(j)(2)(C)(v)(III) (providing that representative payees are fiduciaries of the beneficiary).[6]

---

**6.** Ryan argues also that the federal foster care and adoption assistance statutes, which provide financial aid to state social services depart-

After a hearing, the juvenile court determined that the Department violated Ryan W.'s due process and equal protection rights by failing to notify him before applying his OASDI benefits toward the current costs incurred by the Department on his behalf. In its order, dated 16 June 2011, the juvenile court required the Department to hold $31,693.50, the total amount received by the Department on behalf of Ryan W., in a constructive trust in his name, pending a permanency planning hearing. The June 16 order also declared invalid CO-MAR §§ 07.02.11.29(K) and (L), which require the Department to seek appointment as payee for all potential resources of a child committed to its care and prioritize self-reimbursement for the child's cost of care over the child's individualized needs, because they extended improperly the Department's statutory authority under 42 U.S.C. § 405(j) (2012) and violated the fiduciary obligations the Department owed to the Petitioner. At the contemplated permanency planning hearing, the juvenile court determined that the best use of the OASDI benefits would be to continue the trust and prioritize Ryan W.'s education-related expenses; the court issued an order to that effect on 15 July 2011. The Department appealed.

A panel of the Court of Special Appeals ("COSA") reversed the juvenile court's order in part, concluding that the juvenile court lacked jurisdiction to order the creation of a constructive trust, although maintaining that the Department reimburse Ryan W. in the amount of $8,075.32 for benefits received on his behalf during a period in which the Department incurred lower costs for his care. *In re Ryan W.*, No. 1503, 2012 WL

---

ments and require compliance with permanency planning and other standards, support his claim that state departments of social services should consider foster child's needs in transitioning out of foster care as a top priority for allocating the child's OASDI benefits. *See* 42 U.S.C. 675(1)(D), 675(5)(C) and (H). These statutes, which contain permanency planning requirements similar to those of Maryland, do not mandate that a child's resources be applied to transition services. Rather, they require only that plans be made regarding a child's transition out of foster care. *See id.*

3847359 (Md.Ct.Spec.App. Sept. 5, 2012); *superseded on reconsideration by* 207 Md.App. 698, 56 A.3d 250 (2012).

The Department filed a motion for reconsideration, asking the COSA to correct the amount ordered reimbursed and, alternatively, to hold that the COSA's rationale that "the Juvenile Court is not . . . vested with broad equitable powers to supervise the Department when it is acting in its role as representative payee for foster children committed to its care" barred any order for reimbursement of the funds. While that motion was pending, counsel for Ryan W. filed a petition for writ of *certiorari* with this Court, seeking review of the original COSA decision. On 21 November 2012, the COSA issued a reported opinion on reconsideration reiterating its view that the juvenile court acted outside its authority in establishing a trust, but reducing the amount to be reimbursed to Ryan from $8,075.32 to $660.[7] *In re Ryan W.*, 207 Md.App. 698, 756, 56 A.3d 250, 284 (2012). Because it found that a constructive trust was an improper remedy, regardless of the juvenile court's authority, the COSA declined to decide the question of sovereign immunity raised by the Department as a defense to the claims in Ryan W.'s action. *Id.* at 758, 56 A.3d at 285. The Department petitioned this Court to review that determination, arguing that funds for the constructive

---

7. The COSA encouraged expressly, in its initial opinion, either party to submit a motion for reconsideration of its initial opinion if the amount ordered to be reimbursed was incorrect. According to the first COSA opinion, $8,075.32 was calculated to represent the amount the parties agreed should have been conserved for Ryan because it was received "at a time when it could not be applied to cover costs of current care." That sum included $7,415.32 of the lump-sum benefits the Department received initially, as well as $660, the latter being the difference between the actual cost of care for May 2010 and the amount received in OASDI benefits for that month. *In re Ryan W.*, 207 Md.App. at 758 n. 30, 56 A.3d at 285 n. 30. The Department's motion for reconsideration stated that $7,478.32 was deposited into Ryan's trust account in December 2011. The COSA, upon reconsideration, determined that although this amount was $63 higher than what was conceded by Department's counsel previously, the original concession was in error because the higher calculation was supported by an affidavit submitted in support of the Department's motion for reconsideration. *Id.* The $660 was not addressed in the motion, however, so the COSA ordered that sum to be paid into Ryan's trust account. *Id.*

trust would have to come from the State Treasury and the State's sovereign immunity barred the relief sought.

We granted the parties' petitions for writs of *certiorari*. *In re Ryan W.*, 429 Md. 528, 56 A.3d 1241 (2012); *In re Ryan W.*, 430 Md. 11, 59 A.3d 506 (2013). The questions presented for our consideration are: [8]

1. Did COSA err in holding that a local department of social services has plenary authority to apply for and use a foster child's OASDI benefits without seeking an express grant of authority from the juvenile court to exercise control over the benefits and without providing the foster child with notice and the opportunity to be heard?

2. Did the COSA err in rejecting the juvenile court's exercise of its authority in determining that a total of $31,693.50 was to be conserved in Ryan's best interests?

3. Did the COSA err in upholding state practice and regulations that require automatic, non-discretionary application of all of a foster child's OASDI benefits and that are inconsistent with federal regulations requiring the proper exercise of discretion as a representative payee?

4. Did the COSA err in directing the juvenile court, on remand, to revise it's monetary award against the State by requiring the Department to deposit funds into a foster child's trust account because, as the COSA had already concluded, the juvenile court lacks jurisdiction to enter such an order and because such an order is barred by the doctrine of sovereign immunity?

## STANDARD OF REVIEW

We review the juvenile court's findings of fact in CINA proceedings under the "clearly erroneous standard." *In re Shirley B.*, 419 Md. 1, 19, 18 A.3d 40, 53 (2011) (citations omitted). Therefore, the juvenile court's factual findings will not be disturbed "[i]f any competent material evidence exists

---

8. As alluded to earlier in this opinion at n. 1, the first three questions were raised by Ryan W. in his petition in Case No. 95. The fourth question was raised by the Department in Case No. 101.

in support of the trial court's factual findings. . . ." *Figgins v. Cochrane*, 403 Md. 392, 409, 942 A.2d 736, 746 (2008). The juvenile court's conclusions of law are reviewed without deference. *In re Adoption/Guardianship of Amber R.*, 417 Md. 701, 708, 12 A.3d 130, 134 (2011). Errors of law are generally remanded to the trial court for further proceedings, unless the error is harmless. *In re Shirley B.*, 419 Md. at 19, 18 A.3d at 53. Only where we find a "clear abuse of discretion" will we disturb a lower court's legally sound decision that is based upon factual findings that are not "clearly erroneous." *In re Shirley B.*, 419 Md. at 19, 18 A.3d at 53.

### Ryan's Appeal

Ryan asks this Court to reverse the COSA's determination that a local department of social services possesses plenary authority to apply for and use a foster child's OASDI benefits, without seeking an express grant of authority from the juvenile court to exercise control over the benefits. He asks further that we hold that a local department must provide a foster child with notice and an opportunity to be heard before using a child's survivor's benefits. Although we agree with the COSA that a local department of social services need not seek permission from a juvenile court in order to exercise its statutory and regulatory-guided discretion as a duly appointed representative payee in its use of a foster child's OASDI benefits, we agree with Ryan W. that due process requires that notice be afforded at least to a CINA's attorney when the Department applies to become a payee and as benefits are received.

**A. The Juvenile Court is without jurisdiction to direct the Department's allocation of OASDI benefits for which it is a duly appointed representative payee by the SSA.**

1. *The Social Security Act does not contemplate state court jurisdiction over the allocation of OASDI benefits by a duly appointed representative payee.*

■ The Department argues that, because federal law governs the appointment of representative payees and the alloca-

tion of OASDI benefits, *see* 42 U.S.C. 405(j), the juvenile court is without authority to direct an approved representative payee how to allocate a child's benefits. According to the Department, the proper forum for any available remedy for Ryan's claim lies in the federal administrative and judicial review process. Ryan counters that the juvenile court is a "court of competent jurisdiction" to review SSA determinations. *See* 42 U.S.C. 405(j)(1)(A) ("If the Commissioner ... or a court of competent jurisdiction determines that a representative payee has misused any individual's benefit ... the Commissioner of Social Security shall promptly revoke certification for payment of benefits to such representative payee ... and certify payment to an alternative representative payee or, if the interest of the individual would be served thereby, to the individual."). We conclude that the juvenile court here did not have jurisdiction over the disputes between Ryan and his representative payee regarding the application of his OASDI benefit payments. Rather, such disputes are for resolution within the federal administrative process and subject to further federal judicial review.

■ We look first to the Supremacy Clause of the United States Constitution to determine if state courts may exercise jurisdiction over this dispute, outside of the statutorily-prescribed administrative process for reviewing SSA determinations. "When Congress is silent concerning [concurrent] state court jurisdiction over federal causes of action, there is a 'deeply rooted presumption in favor of concurrent state court jurisdiction.'" *R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc.*, 382 Md. 689, 715, 857 A.2d 1, 16 (2004) (quoting *Tafflin v. Levitt*, 493 U.S. 455, 459, 110 S.Ct. 792, 795, 107 L.Ed.2d 887, 894 (1990)). This presumption, however, "can be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478, 101 S.Ct. 2870, 2875, 69 L.Ed.2d 784 (1981). The Social Security Act provides explicitly that an individual seeking review of a decision made by the Commissioner may do so in a civil action, and that

[s]uch action *shall be brought in the district court of the United States* for the judicial district in which the plaintiff resides, or has his principal place of business, or, if he does not reside or have his principal place of business within any such judicial district, in the United States District Court for the District of Columbia.

42 U.S.C. § 405(g) (emphasis added). Thus, while Congress was silent as to whether state courts have jurisdiction to review SSA determinations, it directs explicitly that federal courts have jurisdiction over civil actions seeking review of the Commissioner's determinations. The statutory language is expressed in mandatory terms that all such actions be brought in a federal district court.[9] *Id.; cf. Tafflin,* 493 U.S. at 460–61, 110 S.Ct. at 796, 107 L.Ed.2d 887 (finding that a federal statute creating a federal cause of action did not exclude state courts from hearing the claims because the statute provided that such claims "may" be brought in federal court). Therefore, because Congress's use of the word "shall" suggests strongly that the jurisdiction of the federal courts is exclusive, we determine that Maryland's state courts are without concurrent subject matter jurisdiction to adjudicate disputes over the allocation of a child beneficiary's OASDI benefits by a duly appointed representative payee.

Generally, federal law governs representative payees and their use of a child beneficiary's OASDI benefits. *See* 42

---

**9.** In *Tafflin,* the Supreme Court analyzed a provision of the federal Racketeer Influenced and Corrupt Organizations ("RICO") statute which created a cause of action for persons injured by a statutorily enumerated prohibited activity. That provision provided that "Any person injured in his business or property by reason of a violation of section 1962 of this chapter *may sue therefor in any appropriate United States district court....*" 18 U.S.C. § 1964(c) (emphasis added). The Court held that the provision granted federal courts jurisdiction over such causes of action, but did not require that all such actions be brought exclusively in federal courts. *Tafflin,* 493 U.S. at 460–61, 110 S.Ct. at 796, 107 L.Ed.2d 887 (citing *Charles Dowd Box Co. v. Courtney,* 368 U.S. 502, 507–508, 82 S.Ct. 519, 522, 7 L.Ed.2d 483 (1962) ("The statute does not state nor even suggest that such jurisdiction shall be exclusive. It provides that suits of the kind described 'may' be brought in the federal district courts, not that they must be.")).

U.S.C. 405(j); 20 C.F.R. § 404.2001. Once appointed, a representative payee is required to use the benefit payments solely for the beneficiary's "use and benefit in a manner and for the purposes [the representative payee] determines . . . to be in [the beneficiary's] best interests." 20 C.F.R. § 404.2035(a). The SSA considers costs associated with the beneficiary's "current maintenance" to be valid expenditures satisfying the requirement that benefit payments be applied "for the use and benefit" of the beneficiary and in line with his or her "best interests." 20 C.F.R. § 404.2040(a)(1). "Current maintenance includes cost[s] incurred in obtaining food, shelter, clothing, medical care, and personal comfort items." 20 C.F.R. § 404.2040(a)(1). For beneficiaries receiving institutional care because of a physical or mental disability, the definition of "current maintenance" is expanded to include "the customary charges made by the institution, as well as expenditures for those items which will aid in the beneficiary's recovery or release from the institution or expenses for personal needs which will improve the beneficiary's conditions while in the institution." 20 C.F.R. § 404.2040(b) (emphasis added). The SSA Commissioner is responsible for promulgating rules and regulations for implementing and executing the provisions of the Social Security Act, in addition to monitoring payees. *See* 42 U.S.C. 405(a). Because this authority is vested solely with the Commissioner, the Maryland juvenile court does not have authority under Maryland law to monitor the allocation of social security benefits by a representative payee. *See PLIVA, Inc. v. Mensing,* —— U.S. ——, 131 S.Ct. 2567, 2570, 180 L.Ed.2d 580 (2011) (holding that the Supremacy Clause requires that "[w]here state and federal law directly conflict, state law must give way").

If a child beneficiary suspects misuse of his or her OASDI benefits by his or her representative payee, the Social Security Act, as amended in 2004, provides the beneficiary with avenues for federal administrative and judicial review. The 2004 amendments include more stringent monitoring of institutional representative payees' use of benefits, as well as broader avenues in which to seek remedy for misuse of benefits by such institutional payees. *See* Social Security

Protection Act of 2004, Pub.L. No. 108–203, 118 Stat. 493, 493 (2004). The amendment, as enacted, defines "misuse" as occurring in any case in which the representative payee "receives payment under this title for the use and benefit of another person and converts such payment, or any part thereof, to a use other than for the use and benefit of such other person." *Id.* at sec. 101(a)(2), § 405(j), 118 Stat. at 495 (codified at 42 U.S.C. § 405(j)(9)).

If a beneficiary is not satisfied with an initial determination made by the Commissioner as to either misuse, eligibility for benefits, or the appointment of a representative payee, the first step in the SSA's internal review process is reconsideration. 20 C.F.R. § 404.907. The SSA provides written notice to all parties of its reconsidered determination, and that decision is appealable to an administrative law judge ("ALJ"). *Id.;* 20 C.F.R. § 404.922. The decision of the ALJ is binding unless one of the parties requests and receives review of the decision by the Appeals Council. 20 C.F.R. §§ 404.967, 404.955(a). The decision of the Appeals Council is reviewable in federal district court, and if the Council declines to review a case, the ALJ's decision is likewise reviewable in a federal district court. 20 C.F.R. § 404.981.

Notwithstanding these provisions, Ryan contends that the juvenile court had subject matter jurisdiction over the Department's allocation of his OASDI benefits pursuant to the COSA's 2001 decision in *Ecolono v. Division of Reimbursements of Department of Health and Mental Hygiene,* 137 Md.App. 639, 769 A.2d 296 (2001). In *Ecolono,* the COSA determined that it had "subject matter jurisdiction to decide a dispute between the beneficiary of social security benefits and his representative payee with respect to the allocation of those benefits." 137 Md.App. 639, 654, 769 A.2d 296, 305. At the time *Ecolono* was decided, the Social Security Act and implementing regulations required only that the SSA provide restitution to a beneficiary for payee misuse if the SSA had been negligent in appointing that payee, or if the SSA recovered the misused funds from the payee. *See* Social Security Protection Act of 2004, Pub.L. No. 108–203, 118 Stat. 493, 493 (2004).

The appellee in *Ecolono* argued that, because there was an administrative review process for appointment of representative payees and a remedy for their breach of duty, state courts were without jurisdiction to interfere with a representative payee's allocation of social security benefits. COSA rejected this argument, reasoning that "nothing in federal law ... indicate[s] an intent by Congress to limit interested parties to the federal administrative and judicial review process and to prohibit State courts from exercising jurisdiction ... when the relief requested is not the removal of the payee but a reallocation of the benefits." *Id.*, 137 Md.App. at 654, 769 A.2d at 305. Notably, however, the 2004 amendments to the Social Security Act now permit the beneficiary to recover full restitution from the SSA where an institutional representative payee misuses the beneficiary's funds. *See* 20 C.F.R. § 404.2041(a). Therefore, unlike the cases relied on by the COSA in *Ecolono, see, e.g., Jahnke v. Jahnke*, 526 N.W.2d 159, 163 (Iowa 1994) ("Although the federal government may prosecute a payee who converts a beneficiary's funds, there is no federal mechanism to prevent such a conversion from occurring. Moreover, once the SSA pays the benefits to the proper representative payee, it has no liability to the beneficiary for misuse of the payments." (quoting 42 U.S.C. § 405(k) (1988))),[10] we are not presented with a scenario in which Ryan has no federal

10. Other states have struggled with the issue of subject matter jurisdiction in state courts over disputes regarding representative payees' use of social security benefits. *See Grace Thru Faith v. Caldwell*, 944 S.W.2d 607, 610 (Tenn.Ct.App.1996) (finding state court jurisdiction over claims alleging misuse of funds by representative payees and emphasizing that absent a showing that the SSA had been negligent in appointing a representative payee, or alternatively, a showing that the payee's breach of duty incurred criminal violations, there was no federal remedy for beneficiaries whose benefits had been misused); *see also In re J.G.*, 186 N.C.App. 496, 508, 652 S.E.2d 266, 273 (2007) (holding that state courts were allowed "to look into the expenditure of dependent social security benefits when an interested party questions the propriety of those expenditures" and reasoning that the trial court had properly acted within its "supervisory role[] in seeing to J.G.'s best interests" and that the *Keffeler II* decision "acknowledged that it was not always appropriate to use all of a juvenile's Social Security funds to reimburse

remedy upon a finding that his representative payee allocated his funds in a manner contrary to federal law and regulations.

■ Because the 2004 amendments to the Social Security Act enhanced the monitoring of institutional representative payees and made available federal remedies for misuse of benefits, the rationale underlying the result in *Ecolono* and cases from other jurisdictions which held that state courts possessed subject matter jurisdiction over disputes regarding the allocation of benefits by representative payees no longer exists. The appropriate forum for seeking review of disputes regarding SSA matters lies within the federal administrative and court systems. Accordingly, the juvenile court erred in directing the Department to establish a constructive trust on Ryan's behalf for funds it had received on his behalf. Having determined that the exercise of discretion by a representative payee in its use of a beneficiary's OASDI benefits is reviewable only in the federal administrative and judicial processes described in the applicable federal statute and regulations discussed *supra*, we hold that a state court does not have jurisdiction to direct a representative payee to allocate funds in a way that, while permitted under federal law, conflicts directly with a valid exercise of the payee's discretion under the federal law.[11] *See Washington Department of Social and Health Services v. Guardianship Estate of Danny Keffeler,*

---

itself, in particular in anticipation of 'impending emancipation.' " (quoting *Keffeler II*, 537 U.S. at 378–79, 123 S.Ct. at 1022, 154 L.Ed.2d at 981–82)); *but see O'Connor v. Zelinske*, 193 N.C.App. 683, 692, 668 S.E.2d 615, 620 (2008) (overruling the holding in *In re J.G.* and reaffirming that the "courts of North Carolina … [do not] have the power to determine that [the] defendant is misusing Social Security benefits paid to him on behalf of the children and to direct that he account for them to some other person" (quoting *Brevard v. Brevard*, 74 N.C.App. 484, 488–89, 328 S.E.2d 789, 792 (1985))). Both *Jahnke* and *Grace Thru Faith* were decided before the 2004 amendments to the Social Security Act, and are therefore not persuasive here.

11. Regarding the Department's compliance with federal law in its use of Ryan's benefit payments, the COSA erred in its interpretation of the regulation permitting institutional costs to be considered "current maintenance" by affording undue significance to certain facts within

537 U.S. 371, 390, 123 S.Ct. 1017, 1028, 154 L.Ed.2d at 972 ("*Keffeler II*") (finding that the anti-attachment provision in 42 U.S.C. 405(j) prohibits a state from directing a representative payee, or a beneficiary, to pay their benefits over to the state). Because we conclude that Maryland state courts lack jurisdiction over disputes regarding a representative payee's allocation of OASDI benefits, we do not reach the issue of whether the Department's allocation of Ryan's benefits complied with federal law, to the extent that the COSA decided that question.

2. *The Courts & Judicial Proceedings Article of the Maryland Code does not grant to the juvenile court the authority to consider and resolve disputes regarding the allocation or use of OASDI benefits for CINA children.*

 Ryan argues that the juvenile court, in directing the Department to conserve benefits received already and spent

---

the illustration provided in 20 C.F.R. 404.2040(b). That illustration presents the following scenario:

An institutionalized beneficiary is entitled to a monthly Social Security benefit of $320. The institution charges $700 a month for room and board. The beneficiary's brother, who is the payee, learns the beneficiary needs new shoes and does not have any funds to purchase miscellaneous items at the institution's canteen.

The payee takes his brother to town and buys him a pair of shoes for $29. He also takes the beneficiary to see a movie which costs $3. When they return to the institution, the payee gives his brother $3 to be used at the canteen.

Although the payee normally withholds only $25 a month from Social Security benefit for the beneficiary's personal needs, this month the payee deducted the above expenditures and paid the institution $ 10 less than he usually pays.

The above expenditures represent what we would consider to be proper expenditures for current maintenance.

20 C.F.R. § 404.2040(b). The COSA's second opinion implies that the regulation addresses explicitly the issue of institutional charges in excess of the beneficiary's social security benefit payments. The regulation cited, however, does not clearly indicate that such a situation is pertinent to the rule set forth in subsection (b). Rather, the illustration provided does not indicate the total income or assets of the institutionalized beneficiary. Most likely, this information is left out because the focus of the illustration is to provide examples of acceptable personal expenses that the representative payee deems necessary, or at least is in line with the language of subsection (b). *See id.*

on his behalf, acted within its statutory authority over children deemed CINA and the Department as their fiduciary. CJP § 3–802(c) (providing that "the court may direct the local department to provide services to a child, the child's family, or the child's caregiver to the extent that the local department is authorized under State law"); *see also* CJP § 3–823(e) (providing for the juvenile court's authority over the child's permanency plan, including transition needs); *accord In re Damon M.*, 362 Md. 429, 436, 765 A.2d 624, 627–28 (2001) ("Services to be provided by the local social service department and commitments that must be made by the parents and children are determined by the permanency plan.") Ryan contends further that, because CJP § 3–821 permits the juvenile court to "direct, restrain, or control" the conduct of a person or entity whenever the court finds that such conduct is not in the child's best interests, the court acted within its statutory authority. The Department contends that the juvenile court misinterpreted its authority to "control the conduct" of a party, and, alternatively, that the "support" of a CINA should be interpreted as meaning "child support" only.

■ As a court of limited jurisdiction, the juvenile court may exercise only those powers granted to it by statute. *In re Franklin P.*, 366 Md. 306, 334, 783 A.2d 673, 689 (2001) ("[W]hen a court proceeds by way of a special statute rather than under its general common-law authority, that court has only the powers given to it under the special statute."); *see also Smith v. State*, 399 Md. 565, 574, 924 A.2d 1175, 1180 (2007). Pursuant to the Courts and Judicial Proceedings Article of the Maryland Code, the juvenile court possesses exclusive original jurisdiction over CINA petitions, CJP § 3–803(a)(2), as well as concurrent jurisdiction over the "[c]ustody, visitation, support, and paternity of a child whom the court finds to be a CINA." CJP § 3–803(b)(1)(i).

The Courts and Judicial Proceedings Article does not provide explicitly that the juvenile court has jurisdiction to consider disputes in the allocation of federal OASDI funds as to CINA persons. In support of his position, Ryan argues that the juvenile court's jurisdiction over the Department's use of

benefits derives from the court's powers over the "support" of a CINA. *See* CJP § 3–803(b)(1)(i); *see also* CJP § 3–819(c)(2) (providing the juvenile court with powers to determine custody, visitation, support or paternity of a CINA). He contends that, because OASDI benefits are meant to replace the "support" a child loses from his wage-earning parent(s) when the parent(s) die, *O'Brien v. O'Brien,* 136 Md.App. 497, 510 n. 5, 766 A.2d 211, 218 n. 5 (2001), the juvenile court's power to determine support of a CINA allows it to "make orders regarding support" of a CINA.

In construing whether the term "support," as used in CJP § 3–819, includes federal survivor's benefits, we must consider the use of the word in the context of the entire CINA statute and the word's "ordinary meaning, absent indications of a contrary intent by the Legislature." *In re Roger S.,* 338 Md. 385, 391, 658 A.2d 696, 699 (1995) (internal citations omitted); *See also City of Baltimore Dev. Corp. v. Carmel Realty Associates,* 395 Md. 299, 318, 910 A.2d 406, 417–18 (2006) ("The plain language of a provision is not interpreted in isolation. Rather, we analyze the statutory scheme as a whole and attempt to harmonize provisions dealing with the same subject so that each may be given effect.").

We have held consistently that the CJP uses the term "support," in regard to CINAs, synonymously with "child support," or the parental obligation to support a child financially. Although CJP § 3–819(c)(2) permits the juvenile court to *determine* support, subsection (1) of § 3–819 provides that the court may order parents to "pay a sum in the amount the court directs to cover wholly or partly the support of the child." CJP § 3–819(*l* ); *see also* Md. Code (1984, 2006 Repl. Vol.) Fam. Law § 5–203(b) (providing that "the parents of a minor child ... are responsible ... for the child's support"). Cases involving the "support" of CINA children also illuminate the plain meaning of the term as parental obligations to support their minor child. *See, e.g., Rosemann v. Salsbury, Clements, Bekman, Marder & Adkins, LLC,* 412 Md. 308, 319–20, 987 A.2d 48 (2010); *In re Katherine C.,* 390 Md. 554, 566–67, 890 A.2d 295 (2006); *In re Joshua W.,* 94 Md.App.

486, 494–95, 617 A.2d 1154 (1993). Because the Department was not collecting or applying for "child support" from the Social Security Administration, we find no merit in Ryan's "support" argument.

Courts & Judicial Proceedings Article § 3–821 also does not provide authority for the juvenile court to act as it did here. CJP § 3–821 permits the juvenile court, where a party is before the court otherwise properly, to "direct, restrain, or control" the conduct of a person or entity whenever the court finds that such conduct is not in the child's best interests.[12] Although the juvenile court is empowered generally to issue orders to control the conduct of the Department, it may do so only regarding issues over which it otherwise has jurisdiction. Here, the agency was not before the court properly because the court lacked subject matter jurisdiction over the particular dispute between Ryan and his representative payee regarding the use of OASDI benefit payments. The COSA held, and we agree, that "a motion to control conduct is not a means by which a Juvenile Court may expand its statutorily enumerated powers." *In re Ryan W.,* 207 Md.App. at 756–57, 56 A.3d at 256.

3. *Because the juvenile court lacked subject matter jurisdiction over this particular dispute, the Department's sovereign immunity defense is moot.*

The Department, in No. 101, contends that the COSA erred in directing the juvenile court, upon remand, to order that $660 be returned to Ryan because of an error in the Department's accounting for the costs of foster care in May 2010.[13]

---

**12.** This authority is granted whenever the conduct at issue
(1) Is or may be detrimental or harmful to a child over whom the court has jurisdiction;
(2) Will tend to defeat the execution of an order or disposition made or to be made under this subtitle; or
(3) Will assist in the rehabilitation of or is necessary for the welfare of the child.
CJP § 3–821.

**13.** The Department conceded in the trial court that $8,075.32 should have been conserved on Ryan's behalf ($7,415.32 of the lump sum

Because we determine that the juvenile court lacked subject matter jurisdiction over the OASDI benefits dispute, the COSA was not entitled to direct the Department to return the benefits it had applied. We therefore decline to reach the Department's sovereign immunity defense because, without subject matter jurisdiction, the defense is moot. We therefore reverse the COSA's judgment to the extent that it ordered that Ryan be reimbursed for any of the OASDI benefit funds in dispute.

### B. The challenged COMAR regulations are valid and in accordance with federal law and policy.

Ryan W. contends that COMAR 07.02.11.29(K) and (L) are invalid because they require "automatic, non-discretion[ary] taking of OASDI benefits without considering transition needs, among others." Specifically, he argues that, because the federal statute and accompanying regulations require that funds be spent in accordance with a beneficiary's "best interests," automatic application of a foster child's benefits to the costs of care violates federal law. In riposte, the Department contends that the COMAR regulations are in accordance with federal law regarding a representative payee's allocation of benefits because the uses of the benefits prescribed in the COMAR sections are permitted explicitly by the federal statute and regulations.

SSA regulations mandate that all representative payees use the OASDI benefits they receive "in a manner and for the purposes *he or she determines*, under the guidelines in [sub-

retrospective OASDI benefits and $660 which was the amount of benefits received in excess of the total costs of care for the month of May 2010). Subsequently, both parties agreed this concession was a mistake of fact. The Department noted in its motion for reconsideration before the COSA that, in December 2011, $7,478.32 was deposited into Ryan's Foster Care Trust Account because that total was not permitted to be used for self-reimbursement because it was part of the lump-sum retrospective benefits. The remaining $660 has not been accounted for, and the COSA held that the Department "remains obligated to conserve an additional $660 for Ryan W." *In re Ryan W.*, 207 Md.App. at 758 n. 30, 56 A.3d at 286 n. 30.

part U of 20 C.F.R. § 404] to be in [the beneficiary's] best interests." 20 C.F.R. § 404.2035(a) (emphasis added). Costs of a beneficiary's "current maintenance," which includes "food, shelter, clothing, medical care, and personal comfort items," are considered by the SSA to be appropriate uses of benefit funds. *See* 20 C.F.R. § 404.2040(a)(1). Additionally, institutional payees are permitted explicitly to use a beneficiary's OASDI benefits for "the customary charges made by the institution, as well as expenditures for those items which will aid in the beneficiary's recovery or release from the institution or expenses for personal needs which will improve the beneficiary's conditions while in the institution." 20 C.F.R. § 404.2040(b). The Department was duly appointed as representative payee by the SSA to receive OASDI benefit payments on Ryan's behalf, and thus was obliged to use the benefits according to federal regulations.

Ryan argues that Maryland regulations, in requiring automatic allocation of funds, are inconsistent with the discretionary nature of the allocation provisions in federal regulations. COMAR 07.02.11.29(K) provides:

(1) Other resources available for the child may be in the form of cash assets, trust accounts, insurance (including survivor's disability insurance), or some type of benefit or supplemental security income for the disabled child.

(2) While in out-of-home placement, if the child is 18 years old or older and is the beneficiary of insurance or survivor's benefits, the child shall choose whether to:

(a) Receive benefits and pay the local department; or

(b) Designate the local department as the payee.

(3) The local department shall seek a representative payee for an incompetent child 18 years old or older.

COMAR 07.02.11.29(L) provides:

The child's resources shall be applied directly to the cost of care, with any excess applied first to meeting the special needs of the child, and the net excess saved in a savings account for future needs. Any potential benefits from other

resources shall be pursued and made available if possible to the local department as payee.

In *Conaway v. Social Services Administration*, 298 Md. 639, 471 A.2d 1058 (1984), we considered whether a representative payee could allocate a beneficiary's benefits towards the cost of caring for the beneficiary. We determined that reimbursement for the costs of providing foster care achieved by applying "current benefits to the current costs of care" was an appropriate use of federal benefits by a duly appointed representative payee. *Conaway*, 298 Md. at 648–49, 471 A.2d at 1063. We addressed specifically the legitimacy of COMAR 07.02.11.29(L), which was denominated as COMAR 07.02.11.07 at the operative time in *Conaway:* [14]

Article 88A, 60 authorizes various payment rates for foster care; however, it does not delineate the source(s) of the funds to be used. The State Director of Social Services is responsible for administering these aspects of the foster care program. Therefore, regulations about foster care payment rates and the source of funds to make these payments are necessary to carry out duties imposed by law. The regulation at issue in this case has accomplished precisely that. COMAR 07.02.11.07 is entitled "Resources for Reimbursement towards Cost of Care." Federal benefits were paid to the State and could have been used to pay for the cost of the child's care. These benefits were committed to the department for the child's benefit. As resources that could offset the cost of care, their use was a proper subject for regulation. Because these regulations were within the statutory authority, they had the force of law; thus, they provided an adequate legal basis for the local department's actions.

*Id.* at 644, 471 A.2d at 1060.

In the present case, the juvenile court declared that subsections (K) and (L) of COMAR 07.02.11.29 were invalid because

---

**14.** The differences between the prior version of the regulation and its current iteration are non-substantive.

of the conflict with federal law providing for discretion to a representative payee in allocating a beneficiary's OASDI benefits. *See* 20 C.F.R. § 404.2035(a). The Department applied for Ryan's OASDI benefits on his behalf as representative payee and used the benefits, pursuant to this state regulation (and allowed by the federal statutes and regulations) to reimburse itself partially for the expenses it incurred for Ryan's foster care. This practice is consistent with federal law, which allows "current maintenance" and "customary charges" as appropriate expenditures by institutional payees. We agree with the COSA that the other contested provision, COMAR 07.02.11.29(K)(2), "was not implicated in Ryan's case as he was under 18 [years old] when the Department became his representative payee and, in any event, during proceedings before the Juvenile Court, a Department witness testified that the regulation is not enforced." *In re Ryan W.*, 207 Md.App. at 748, 56 A.3d at 280.

C. **Due Process requires, however, notice at least to a child's legal representative whenever the Department applies for and receives OASDI benefits on the child's behalf as his or her representative payee.**

 Ryan asks us to overturn the COSA's holding that the Department's failure to provide notice or an opportunity to be heard did not violate his due process rights. He argues that the notice required to be given by the Commissioner is insufficient because, as the federal regulations applied to Ryan's situation, notice that the Department would become his representative payee was provided only to the Department as his legal guardian. Ryan contends that the Department's fiduciary obligations require it to notify a child or his or her counsel upon receipt of benefits.[15]

 The Fourteenth Amendment of the U.S. Constitution, as well as Article 24 of the Maryland Declaration of Rights (usually read *in pari materia* with the federal analogue),

---

15. In Maryland, a child who is the subject of a CINA proceeding is entitled to counsel. CJP §§ 3–813(a), (d)(1).

prohibits the deprivation of life, liberty, or property without due process of law. *Roberts v. Total Health Care, Inc.*, 349 Md. 499, 509, 709 A.2d 142, 146–47 (1998) ("At the core of due process is the right to notice and a meaningful opportunity to be heard.") (internal citations omitted). Prior to considering whether an individual's right to due process was violated, we must determine first that "(1) State action has been employed (2) to deprive that [individual] of a substantial interest in property." *Id.* at 510, 709 A.2d 142, 147. Here, the Department, a government actor, applied to be Ryan's representative payee (without notice to him or his CINA counsel) and used the OASDI benefits to reimburse itself for the costs of his foster care (also without notice). Because Ryan, like all OASDI beneficiaries, has a property interest in his benefits, *see Tucker v. Tucker*, 156 Md.App. 484, 492–93, 847 A.2d 486, 490–91 (2004) (holding that a child's social security benefits belong to the child and should not be included in the parent's "income" when determining child support obligations), the Department's actions implicate Ryan's due process rights.

In determining what process is due, this Court will balance both the government interests and the private interests affected. *Id.* (citing *Department of Transportation v. Armacost*, 299 Md. 392, 416–20, 474 A.2d 191, 203–05 (1984)). The U.S. Supreme Court outlined three factors that courts should weigh in determining the process due in a given situation under the Fourteenth Amendment:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18, 33 (1976).

The Washington Supreme Court, in *Guardianship Estate of Keffeler ex rel. Pierce v. State*, 151 Wash.2d 331, 88 P.3d 949, 956 (2004) (*"Keffeler III "*),[16] considered whether a Washington State department of social services violated children beneficiaries' due process rights when it used the benefits to reimburse itself for the costs of foster care. The court determined that "[t]he federal notice sent to beneficiaries and their guardians is sufficient to fulfill any procedural due process rights the children may have" and that "[a]ny potential private interest in additional notice is outweighed by the State's interest in efficient administration of its foster care program." *Keffeler III*, 151 Wash.2d at 345, 88 P.3d at 956. The thrust of the court's reasoning was that the risk of deprivation was minimal because of the notice SSA provides before appointing a representative payee, and again subsequently before certifying payment to that payee. *Id.* at 344, 88 P.3d at 955. Additionally, the court emphasized that additional procedures (other than the notice provided already by the Commissioner in accordance with federal law) would be unnecessary because "the identity of a representative payee does not influence eligibility for benefits and all representative payees must use the bene-

---

**16.** The Washington Supreme Court considered *Keffeler III* on remand from the U.S. Supreme Court decision in *Keffeler II*. *See Washington State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 123 S.Ct. 1017, 154 L.Ed.2d 972 (2003) (*"Keffeler II "*). In *Keffeler II*, the Supreme Court addressed whether the Social Security Act permitted a state institution, serving as representative payee for children in foster care, could reimburse itself for a child's cost of care. The Court held that, because the Washington Department of Social and Health Services ("DSHS") was in lawful possession of the benefit moneys in its capacity as a duly appointed representative payee and had used those funds in accordance with federal regulations, its practice of self-reimbursement did not violate § 407 of the Social Security Act. *Id.* at 390, 123 S.Ct. at 1025, 154 L.Ed.2d at 972. Further, although declining to consider whether DSHS had violated § 405(j) by using the funds for past care and for costs covered already by other federal assistance funds, the Supreme Court recognized expressly that the Commissioner's determination "that a representative payee serves the beneficiary's interest by seeing that basic needs are met," rather than "maximizing a trust fund attributable to fortuitously overlapping state and federal grants," was subject to judicial deference. *Id.* at 390, 123 S.Ct. at 1028, 154 L.Ed.2d at 989.

fits in accordance with federal and state laws and regulations." *Id.* at 344, 88 P.3d at 955.

We disagree with the conclusions of the Washington Supreme Court in analyzing the *Mathews* factors, as applied to the facts of the present case. *See Keffeler III,* 151 Wash.2d 331, 345, 88 P.3d 949, 956 (finding that the Commissioner's notice was sufficient because there was only a minimum risk that childrens' interest in their benefit payments would be erroneously deprived, and because the state's interests in administrative efficiency outweighed the interests of the foster children in their benefits). The private interest at stake here is Ryan W.'s interest in the "free use of his social security benefits." *See McGrath v. Weinberger,* 541 F.2d 249, 253–54 (10th Cir.1976). The notice provided by the Commissioner, pursuant to 42 U.S.C. § 405(j)(2)(E)(ii) and 20 C.F.R. § 404.2030(a), before appointing a representative payee and before certifying the first benefit payment, in cases like Ryan's, goes directly to the representative payee (the Department as Ryan's legal guardian). Because the representative payee—in this case, the Department—has discretion in determining the proper allocation of a child's social security benefits, the risk that the child might be deprived erroneously of his or her interest in the benefits may also be substantial. *Contra Keffeler III,* 151 Wash.2d at 345, 88 P.3d at 956. Congress recognized this risk when it amended the Social Security Act in 2004 to provide more remedies for payee misuse of benefits. *See* Social Security Protection Act of 2004, Pub.L. No. 108–203, 118 Stat. 493, 493 (2004) (adding federal remedies for misuse and removing the negligence requirement for restitution of benefits misused by institutional payees).

Central to our earlier conclusion here, that an institutional payee may exercise its discretion in allocating a child's social security benefits without the supervision of the juvenile court, is the presence of a federal administrative and judicial review process which serves a checks-and-balances function required to prevent, and remedy, where applicable, improper use of a child beneficiary's social security benefits. Without actual and direct notice, however, a child beneficiary, through his legal

representative, is unlikely to know of and utilize timely the review process added by the 2004 amendments to the Social Security Act. *See id.* If the beneficiary is neither aware that he or she is entitled to benefits, nor that a representative payee is receiving and using those benefits on his or her behalf, he or she is unlikely to benefit from the presence of an adequate federal remedy to test perceived irregularities. Because the juvenile court holds regular hearings to review the permanency plan of every child committed to the Department, *see* CJP § 3–823(h)(1)(i), and because the Department is required to submit its recommendations for the child's permanency plan prior to the hearing, *see* CJP § 3–823(d), requiring the Department to provide notice to the child's appointed legal representative in the CINA proceeding that the Department has applied to the SSA to be the payee of the child's OASDI benefits and, if approved, is receiving the child's social security benefits on behalf of the beneficiary is not such a burden as to hinder meaningfully the "[s]tate's interest in efficient administration of its foster care system." *Keffeler III,* 151 Wash.2d at 345, 88 P.3d at 956.

We therefore conclude that the Department (or its local department of social services) must notify a CINA, through his or her legal counsel, contemporaneously with its application to be appointed as the child's representative payee, that it has so applied. Further, when the Department receives benefit payments for the period since the last permanency planning hearing, the child's CINA attorney must be notified by the Department of the amount and date of receipt. The child's attorney should be aware of all a child's resources, including OASDI benefits, in order to fulfill his or her duty in advocating with the Department for the child's best interests, which may include services needed for transitioning out of foster care. The notice to be provided by the Department is also for the purpose of allowing a child beneficiary, through his or her legal counsel, to facilitate the child's ability to seek federal administrative and/or judicial review of SSA determinations and of the Department's use of his or her benefits. This holding as to notice should not be read to conflict with our

earlier conclusion that the juvenile court lacks subject matter jurisdiction to direct the allocation of OASDI benefits. Additionally, this holding should not be construed to diminish the authority of the juvenile court in ordering that a local department of social services provide services prescribed by Maryland law to a child in foster care.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS IN CASE NO. 95 AFFIRMED IN PART AND REVERSED IN PART, CONSISTENT WITH THIS OPINION; CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AND TO DISMISS RYAN W.'S MOTION TO CONTROL CONDUCT IN THE CIRCUIT COURT; COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS TO BE PAID TWO-THIRDS BY THE DEPARTMENT AND ONE-THIRD BY RYAN W.**

**CASE NO. 101 IS DISMISSED AS MOOT; COSTS TO BE PAID BY THE DEPARTMENT.**

ADKINS, J., dissenting, which BELL, C.J., (ret.) joins.

I disagree with the Majority's analysis of the jurisdictional issue. Ryan's claims against the Department arise from an alleged breach of fiduciary duty. The Majority concludes, however, that the appropriate forums for the resolution of such claims are "federal administrative and court systems." Maj. Op. at 600, 76 A.3d at 1062. This may have been a proper conclusion had Ryan sought restitution of the allegedly misused benefits from the Social Security Administration (the "SSA") by relying on the provisions in the Social Security Act (the "Act") and the underlying regulations. But Ryan is not seeking restitution from the SSA. He sought to recover the allegedly misused funds by way of a common-law claim. As a court with supervisory authority over "support" of Ryan, a Child in Need of Assistance ("CINA"), the juvenile court had jurisdiction to hear Ryan's case.

As the Majority acknowledges, "[w]hen Congress is silent concerning [concurrent] state court jurisdiction over federal

causes of action, there is a 'deeply rooted presumption in favor of concurrent state court jurisdiction.'" Majority Op. at 595, 76 A.3d at 1059 (quoting *R.A. Ponte Architects, Ltd. v. Investors' Alert, Inc.*, 382 Md. 689, 715, 857 A.2d 1, 16 (2004), in turn quoting *Tafflin v. Levitt*, 493 U.S. 455, 459, 110 S.Ct. 792, 795, 107 L.Ed.2d 887 (1990)). This presumption can only "be rebutted by an explicit statutory directive, by unmistakable implication from legislative history, or by a clear incompatibility between state-court jurisdiction and federal interests." *Gulf Offshore Co. v. Mobil Oil Corp.*, 453 U.S. 473, 478, 101 S.Ct. 2870, 2875, 69 L.Ed.2d 784 (1981).

I submit that none of the three abovementioned rebuttals to the presumption of concurrent state jurisdiction are present in this case.

In holding that federal courts enjoy exclusive jurisdiction, the Majority does not take into account the crucial fact that Ryan's claims are against the Department, not the SSA. Rather, the Majority treats the jurisdictional issue in this case as if the question were as to which court had jurisdiction to review the SSA's determination regarding an alleged misuse of the benefits by a representative payee. In answering this hypothetical question, instead of the one presented in this case, the Majority offers several possible reasons for concluding as it does without picking a favorite.

One such possibility the Majority considers is that the Social Security Act itself reserves exclusive jurisdiction to federal courts. *See* Maj. Op. at 596, 76 A.3d at 1060 (citing the "shall be brought in the district court" language from 42 U.S.C. § 405(g)). According to the Majority, "Congress's use of the word 'shall' **suggests strongly** that the jurisdiction of the federal courts is exclusive." Maj. Op. at 596, 76 A.3d at 1060 (emphasis added).[1] Yet the Majority cites no case holding

---

1. That the phrase "shall be brought in the district court" necessarily carries a mandatory connotation is not a foregone conclusion. While there is no case interpreting the "shall" language in the Social Security Act, it has been interpreted in other contexts. For instance, many

that federal courts have exclusive jurisdiction over a claim, not against the SSA, but against a representative payee, and I have found none. The only claim that is authorized by the SSA for misuse of funds by a representative payee is a claim by a beneficiary **against the SSA** for recovery of those benefits. I submit that the term "shall" in the Act refers to filing a claim for judicial review of a decision made by the Commissioner of the SSA regarding such a claim.

A number of other states have found state court jurisdiction even with similar "shall" language in place. *See Ecolono v. Div. of Reimbursements of Dep't of Health and Mental Hygiene,* 137 Md.App. 639, 769 A.2d 296 (2001); *Grace Thru Faith v. Caldwell,* 944 S.W.2d 607 (Tenn.Ct.App.1996); *Jahnke v. Jahnke,* 526 N.W.2d 159 (Iowa 1994); *In re J.G.,* 186 N.C.App. 496, 652 S.E.2d 266 (2007). The Majority distinguishes those cases only by pointing out that they were decided prior to the 2004 amendments to the Act:

> Because the 2004 amendments to the Social Security Act enhanced the monitoring of institutional representative payees and made available federal remedies for misuse of benefits, the rationale underlying the result in *Ecolono* and cases from other jurisdictions . . . no longer exists.

Maj. Op. at 600, 76 A.3d at 1062.

But the lack of a Federal remedy was not the only, or even the primary, basis for these cases. For example, in *Matter of Kummer,* the New York appellate court was clear:

---

federal courts have held that, in the context of the "Resource Conservation and Recovery Act" ("RCRA"), the "shall be brought" language "unambiguously demonstrates that federal courts have exclusive jurisdiction over RCRA claims." *See, e.g., Litgo New Jersey Inc. v. Comm'r New Jersey Dep't of Envtl. Protection,* 725 F.3d 369 (3d Cir.2013). Yet, the United States Court of Appeals for the Sixth Circuit has held that the "shall be brought in the district court" language in RCRA "does not affirmatively divest the state courts of their presumptive jurisdiction." *Davis v. Sun Oil Co.,* 148 F.3d 606, 612 (6th Cir.1998); *see also Yellow Freight System, Inc. v. Donnelly,* 494 U.S. 820, 823, 110 S.Ct. 1566, 1569, 108 L.Ed.2d 834 (1990) (holding that the enforcement provisions of Title VII, which provide that federal courts "shall have jurisdiction," do not "expressly confine[ ] jurisdiction to federal courts or oust[ ] state courts of their presumptive jurisdiction").

> [I]t is our view that whether or not a Federal cause of action exists is irrelevant. The implication of a Federal cause of action for breaches of Federal statutes is of importance in many cases only because it furnishes the jurisdictional predicate for access to the Federal courts ... and not, as the administratrix would have it, because absent such an implied Federal right of action an injured party is without a remedy for wrongs committed against him.

*Matter of Kummer,* 93 A.D.2d 135, 160–61, 461 N.Y.S.2d 845, 861 (N.Y.App.Div.1983) (emphasis added).

The *Kummer* court distinguished cases involving the SSA's actions or decisions:

> The four cases cited by the administratrix dealt with eligibility, the amount of benefits, whether Federal officials had appointed an improper representative payee, and who should control the funds as representative payee. Our case deals with the representative payee's account, that is with the propriety of his expenditures of benefits.

*Matter of Kummer,* 93 A.D.2d at 156, 461 N.Y.S.2d at 858 (N.Y.App.Div.1983).

The Tennessee Court of Appeals also rejected an argument similar to the Department's here, concluding:

> Therefore, the federal statutes and regulations allow for claims beyond those expressly provided for therein and contain no language indicating an intent to preempt state court jurisdiction. Moreover, a state claim by a beneficiary for recovery of funds misused by a payee does not conflict with the federal statutes and regulations.

*Grace Thru Faith,* 944 S.W.2d at 611 (Tenn.Ct.App.1996).

Our own intermediate appellate court concluded that the state had jurisdiction over a similar claim, reasoning:

> Regardless of the extent of the duty of the SSA to monitor the expenditure of benefits by representative payees, **we find nothing in federal law to indicate an intent by Congress to limit interested parties to the federal administrative and judicial review process and to prohibit**

**State courts from exercising jurisdiction,** in the case before us, when the relief requested is not the removal of the payee but a reallocation of the benefits. Consequently, we conclude that we have subject matter jurisdiction to decide a dispute between the beneficiary of social security benefits and his representative payee with respect to the allocation of those benefits.

*Ecolono,* 137 Md.App. at 654, 769 A.2d at 305 (2001).

Before the 2004 amendments, the SSA reimbursed beneficiaries whose benefits had been misused by their representative payees only if the SSA was negligent in appointing or monitoring the representative payee. The 2004 amendments to the Act expanded the remedy to beneficiaries in cases where the representative payee was not an individual, unless that individual serves 15 or more beneficiaries. 42 U.S.C. § 405(j)(5). In those types of misuse cases, the SSA will make restitution to the beneficiary even in the absence of the SSA's negligence. *Id.* Neither before nor after the 2004 amendments, however, did the representative payee provisions of 42 U.S.C. §§ 405 and 1383 give a private cause of action to a beneficiary against the representative payee. *See Bates v. Northwestern Human Servs., Inc.,* 466 F.Supp.2d 69, 98 (D.D.C.2006) (denying a claim under the Act because "it is clear that nothing in these statutes expressly states that a beneficiary may file a lawsuit against a representative payee who has misused his or her benefits payments or otherwise violated the terms of the representative payee provisions").

Notably, although denying Bates' federal claim under the Social Security Act, the Federal District Court for the District of Columbia ruled in favor of Bates' common-law claims for accounting and unjust enrichment against the representative payee. *Id.* at 102–03 ("The plaintiffs allege, and the defendants do not dispute, that (1) the defendants served as the plaintiffs' representative payees under the Social Security Act; (2) in that capacity, the defendants received federal benefits intended for the plaintiffs; and (3) the defendants owed a fiduciary duty to the plaintiffs as a result of their representative payee status.... These allegations are more than suffi-

cient to sustain a claim of unjust enrichment at the pleading stage").

The Majority holds that federal courts have exclusive jurisdiction over claims such as Ryan's. Applying the reasoning of *Bates*, I strongly disagree. The Social Security Act does not afford beneficiaries a private right of action against representative payees. This is the nature of Ryan's action—it is an attempt to recover allegedly misused benefits directly from the Department. Ryan's "Motion for Order Controlling Conduct to Conserve Social Security Survivor's Benefits" is akin to an unjust enrichment claim under state law, and the facts alleged suffice under the *Bates* standard for viable breach of fiduciary duty or unjust enrichment claims.

Nor does the Act suggest that state law remedies against the representative payee are precluded. All that 42 U.S.C. § 405 has ever allowed a beneficiary to do is to seek to have the SSA enforce the statutory provisions and assist with obtaining restitution of misused benefits from the SSA. This is where the need to exhaust the administrative remedies comes in. In order to have the SSA reimburse the representative payee's misused benefits, the beneficiary must follow the administrative process.[2] *See Monet v. Mathews*, 535 F.Supp.2d 132, 134 (D.D.C.2008) (outlining all of the prerequisite steps in the administrative review process). If, after having exhausted the administrative remedies, the beneficiary is dissatisfied with the outcome, he can then seek judicial review of the SSA's determination in federal court. In that instance, the beneficiary's claim is not against the representa-

---

2. The Department contends that the beneficiary must always seek resolutions of issues pertaining to benefits—even after they have been paid and spent by a representative payee—through the SSA. This argument is unconvincing. The Social Security Act expressly refers to determinations of "a court of competent jurisdiction" with regard to misuse of payments: "If the Commissioner of Social Security or a court of competent jurisdiction determines that a representative payee has misused any individual's benefit paid to such representative payee ..., the Commissioner of Social Security shall promptly revoke certification for payment of benefits to such representative payee...." 42 U.S.C. § 405(j)(1)(A).

tive payee. Rather, it is for the judicial review of the SSA's determination, and any recovery will be from the SSA. *See* 42 U.S.C. § 405(g) ("Any individual, after any final decision of the Commissioner of Social Security ... may obtain a review of such decision by a civil action ... brought in the district court of the United States"); *see also* 42 U.S.C. § 405(c)(9). ("Decisions of the Commissioner of Social Security under this subsection shall be reviewable by commencing a civil action in the United States district court").

The failure of the Act to allow beneficiaries to bring direct claims against representative payees in federal courts is the reason why the D.C. Federal District Court dismissed a claim in which beneficiaries tried to do just that. *See Bates*, 466 F.Supp.2d at 98. There, the Court dismissed certain counts against a representative payee alleging violations of 42 U.S.C. §§ 405 and 1383 and their implementing regulations because, as the court explained, "whether or not Congress intended to create a private right under the representative payee provisions of 42 U.S.C. §§ 405 and 1383, there is no indication of further congressional intent to fashion a privately enforceable remedy for such a right." *Bates*, 466 F.Supp.2d at 97. Yet *Bates*, decided *after* the 2004 amendments to the Act, allowed a common-law claim to proceed. *Id.* at 102. Although the 2004 amendments to the SSA added a federal remedy against the Administration, it did not contain any language suggesting that a direct action against the representative payee in state court was prohibited. *See Tafflin v. Levitt*, 493 U.S. 455, 459, 110 S.Ct. 792, 795, 107 L.Ed.2d 887 (1990); *see also Charles Dowd Box Co., v. Courtney*, 368 U.S. 502, 507–508, 82 S.Ct. 519, 522–523 ("We start with the premise that nothing in the concept of our federal system prevents state courts from enforcing rights created by federal law. Concurrent jurisdiction has been a common phenomenon in our judicial history, and exclusive federal court jurisdiction over cases arising under federal law has been the exception rather than the rule"). As the Supreme Court has explained, "[t]o rebut the presumption of concurrent jurisdiction, the question is not whether any intent at all may be divined from legislative

silence on the issue, but whether Congress in its deliberations may be said to have affirmatively or unmistakably intended jurisdiction to be exclusively federal." *Tafflin,* 493 U.S. at 462, 110 S.Ct. at 797.

In sum, Ryan's claim against the Department is a common-law cause of action for unjust enrichment or breach of fiducia-ry duty that is not precluded by any provision of the Social Security Act.

## Juvenile Court's Supervisory Jurisdiction Over CINA Matters

The juvenile court is well suited to hear and adjudicate this matter. At the time Ryan became aware of the Department's alleged misuse of his benefits, he was a Child in Need of Assistance. Then, and almost the entire time since he was found to be a CINA in 2002, Ryan had been in the custody of the Department. In accordance with Section 3–823 of the Courts and Judicial Proceedings Article of the Maryland Code ("CJP"), Ryan and the Department came before the juvenile court for regular CINA review hearings. The purpose of those hearings was for the juvenile court to ensure that the services the Department provided to Ryan were consistent with his best interests. *See* Md. Code (2002, 2013 Repl. Vol.) CJP § 3–819(g).

It was in that same juvenile court, which over the years presided over Ryan's numerous review hearings, that Ryan filed the "Motion for Order Controlling [the Department's] Conduct to Conserve Social Security Survivor's Benefits." He asked the juvenile court to order the Department to conserve in a trust account for Ryan's future needs the $31,693.30 in Social Security Old Age, Survivor, and Disability Insurance benefits that it had received as Ryan's representative payee from the SSA.

As Ryan and the amici correctly point out, the General Assembly has given Maryland's juvenile courts broad supervi-sory powers to protect the best interests of children who were found CINA. *See* CJP § 3–802. Indeed, as we have explained:

In light of the [juvenile court] statute, and also in light of the language of some of the cases, it has become the practice to speak in terms of *the* juvenile court's "jurisdiction." The Constitution of Maryland, however, does not provide for a separate juvenile court. The Constitution provides that the courts of general jurisdiction are the circuit courts. Accordingly, a juvenile court, despite the statutory language, is part of the circuit court, and exercises the jurisdiction of that court.

*In re Franklin P.,* 366 Md. 306, 311 n. 2, 783 A.2d 673, 677 n. 2 (2001) (emphasis in original).

There are also several statutory provisions that specifically address financial support of CINA children and the juvenile court's supervision of local departments of social services. First, CJP § 3–803, titled "Jurisdiction of court," expressly states that juvenile courts have "concurrent jurisdiction over: (i) Custody, visitation, **support,** and paternity of a child whom the court finds to be a CINA." CJP § 3–803(b)(1)(I) (emphasis added); *see also* CJP § 3–819(c)(2) (stating that the court may "[d]etermine custody, visitation, support, or paternity of a child"). This suggests that juvenile courts do indeed have the authority to resolve disputes involving financial support to CINA children.

Juvenile courts also have broad supervisory power over the local departments of social services, which sometimes, as in the present case, are entrusted with managing financial resources of a child found to be a CINA. Namely, CJP § 3–802(c) allows "the court [to] direct the local department to provide services to a child ... to protect and advance a child's best interests." Specifically with respect to a child's property, CJP § 3–819(g) provides that a guardian, including the local department, "has no control over the property of the child unless the court expressly grants that authority." Accordingly, juvenile courts have broad supervisory powers over the Department generally and its handling of a CINA child's property.

Despite these statutory provisions, the Court of Special Appeals held that the juvenile court had no jurisdiction to hear Ryan's claims.[3] *In re Ryan W.,* 207 Md.App. 698, 757, 56 A.3d 250, 285 (2012). The court reasoned that the "statutorily enumerated authority over 'support' of children declared CINA" does not include "the Department's use of benefits it had received on his behalf as a duly appointed representative payee." *Id.* In the court's view, the term "support" only includes such obligations as "child support." *Id.* The intermediate appellate court did not provide support or an explanation for this conclusion but moved on to summarily conclude that, even if "support" encompassed more than "child support," "the Juvenile Court has [no] plenary equitable powers to order the Department to place monies already collected and disbursed in a trust for the benefit of the CINA." *Id.*

But that is not so. Setting aside the statutory sources of the juvenile court's specific authority to oversee the issues relating to financial support of children in CINA cases and to supervise the Department's conduct in these cases, "[i]t is a fundamental common law concept that the jurisdiction of [juvenile] courts is plenary so as to afford whatever relief may be necessary to protect the [child's] best interests." *Wentzel v. Montgomery Gen. Hosp., Inc.,* 293 Md. 685, 702, 447 A.2d 1244, 1253 (1982). The juvenile court, "acting under the State's *parens patriae* authority, is in the unique position to marshal the applicable facts, assess the situation, and determine the correct means of fulfilling a child's best interests." *In re Mark M.,* 365 Md. 687, 707, 782 A.2d 332, 343–44 (2001).

While Ryan bounced from one group home to the next, sometimes staying at places that allegedly lacked basic necessities but cost $6,000 a month, the Department used Ryan's social security benefits to reimburse itself for the cost of this care. It is difficult to imagine any court—other than the juvenile court—more familiar with Ryan's circumstances and

---

**3.** Yet, before holding that the juvenile court had no jurisdiction, the Court of Special Appeals had resolved the case on its merits, at least in part.

thus in a better position to determine whether the Department's use of the benefits in such a way was in Ryan's best interest.

## Conclusion

In conclusion, because the Social Security Act does not preclude a common-law action for unjust enrichment or breach of fiduciary duty against a representative payee, and the juvenile court is authorized to adjudicate matters related to protecting the bests interests of children designated CINA, I would allow Ryan's action to go forward based on the allegations plead.

For these reasons, I most respectfully dissent.

Chief Judge BELL (ret.) authorizes me to state that he shares the views set forth in this dissenting opinion.